PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

DOUGLAS CHRISTOPHER THOMAS,
Petitioner-Appellant,

v.

No. 98-22

JOHN TAYLOR, Warden, Sussex I
State Prison,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-96-1502-A)

Argued: January 27, 1999

Decided: March 16, 1999

Before ERVIN, LUTTIG, and KING, Circuit Judges.

_____

Dismissed by published opinion. Judge Luttig wrote the opinion, in
which Judge Ervin and Judge King joined.

_____

COUNSEL

**ARGUED:** Lawrence Hunter Woodward, Jr., Lisa Palmer O'Donnell,
SHUTTLEWORTH, RULOFF & GIORDANO, P.C., Virginia Beach,
Virginia, for Appellant. Pamela Anne Rumpz, Assistant Attorney
General, OFFICE OF THE ATTORNEY GENERAL, Richmond,
Virginia, for Appellee. **ON BRIEF:** Mark Evan Olive, VIRGINIA
CAPITAL REPRESENTATION RESOURCE CENTER, Richmond,

Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

LUTTIG, Circuit Judge:

Douglas Christopher Thomas appeals the district court's dismissal of his petition for writ of habeas corpus, challenging his conviction in Virginia state court for capital murder. We deny Thomas' motion for a certificate of appealability and dismiss the appeal.[1]

I.

Early in the morning of November 10, 1990, appellant Douglas Christopher Thomas shot and murdered J.B. and Kathy Wiseman as they slept in their home in Middlesex County, Virginia. At the time of the murders, Thomas, who was then 17, was living nearby with his aunt and uncle, Brenda and Herbert Marshall, and his niece, Lanie Creech, then 12.

Thomas murdered the Wisemans at the behest of their daughter, Jessica, then 14, whom he was dating, because the Wisemans had been threatening to break up their relationship. On November 6, a few days before the murders, Creech overheard Thomas plotting with Jessica to "[g]et[ ] rid of her parents." Jessica asked Thomas "if he had enough bullets"; Thomas said that he did. Jessica Wiseman and Thomas then set a time to meet at the Wisemans' house in order to carry out the murders.

_____

[1] Because appellant filed his petition for writ of habeas corpus on March 25, 1997, after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) on April 24, 1996, our review of the petition is governed by the deferential standards of 28 U.S.C. § 2254(d), as amended by the AEDPA. See Green v. French, 143 F.3d 865, 868 (4th Cir. 1998), cert. denied , 119 S. Ct. 844 (1999).

At some point during the week before the murders, the Marshalls, with whom Thomas was living, traveled to Roanoke, Virginia, on a hunting and fishing trip. In order to ensure that the Marshalls did not return unexpectedly and thereby disrupt the plan to murder the Wisemans, Thomas drove to Roanoke and cut the brake lines on the Marshalls' truck.

On November 9 -- the night of the murders -- Thomas admitted to Creech that he was "going over to Jessica's . . . [t]o kill two people." Thomas told Creech that his plan was to go over to the Wisemans' house, shoot the Wisemans, and return home and pretend to be sleeping; Jessica would then come to the Marshalls' house and bang on the door in feigned panic.

After talking to Creech, Thomas left his house with a shotgun loaded with buckshot and went over to the Wisemans' house, stopping along the way to smoke marijuana. Upon reaching the house, Thomas climbed in through the window of Jessica's bedroom, and briefly stopped to talk to Jessica and smoke more marijuana. Thomas then went to the Wisemans' bedroom. There, he shot J.B. Wiseman once in the head at close range, killing him instantly. He next proceeded to shoot Kathy Wiseman in the head, essentially destroying the left side of her face.

Thomas then returned to Jessica's bedroom. Despite her horrific injury, Kathy Wiseman was not immediately killed, but managed to walk down the hall to Jessica's bedroom in order to check and see whether her daughter was OK. Upon seeing her mother standing at the doorway to her bedroom, Jessica yelled, "Oh God, Chris, please shoot her again." According to his subsequent confession, Thomas obliged her request, shooting Kathy Wiseman again in the head and this time killing her instantly. Thomas then returned home; a short time later, Jessica carried out the final stage of the plan, going to the Marshalls' house and banging on the door in feigned panic. Later that same day, Thomas confessed to both murders.

Thomas pled guilty to the first-degree murder of J.B. Wiseman and related firearms charges, and not guilty to the capital murder of Kathy Wiseman and related firearms charges. He was tried for the murder of Kathy Wiseman as an adult. On Friday, August 23, 1991, a jury

3

found Thomas guilty on all counts. On Monday, August 26, the same jury sentenced Thomas to death, finding as an aggravating factor that his conduct in committing the murder was vile, horrible, or inhuman, and finding no mitigating circumstances. See Va. Code § 19.2-264.2. On November 11, the trial judge imposed the death sentence and sentenced Thomas to a further sixty-seven years in prison for the murder of J.B. Wiseman.**2**

On June 5, 1992, the Virginia Supreme Court affirmed Thomas' conviction and sentence, see Thomas v. Commonwealth, 244 Va. 1 (1992), and on November 2, 1992, the United States Supreme Court denied Thomas' petition for writ of certiorari , see Thomas v. Virginia, 506 U.S. 958 (1992). On July 26, 1993, Thomas filed a petition for writ of habeas corpus in Virginia state court; on June 17, 1996, the Virginia Supreme Court dismissed the petition. On March 25, 1997, Thomas filed this petition for writ of habeas corpus in the United States District Court for the Eastern District of Virginia. After granting Thomas extensive discovery, the district court dismissed the petition on June 11, 1998. From that order of dismissal, Thomas now appeals.

II.

Appellant initially contends that he was deprived of due process because he was sentenced by a jury, rather than by the trial judge. Specifically, he claims that, under a state law in effect at the time of his sentencing, he was entitled to be sentenced by the trial judge because he was a juvenile defendant charged as an adult. The statute read as follows:

> In the hearing and disposition of felony cases properly before a circuit court having criminal jurisdiction of such offenses if committed by an adult, the court, after giving the juvenile the right to a trial by jury on the issue of guilt or innocence and upon a finding of guilty, may sentence or commit the juvenile offender in accordance with the criminal laws of this Commonwealth or may in its discretion deal

---

**2** Jessica Wiseman was tried as a juvenile and briefly placed in juvenile detention. She is now free.

4

with the juvenile in the manner prescribed in this law for the hearing and disposition of cases in the juvenile court.

Va. Code § 16.1-272 (1991).**3**

As the district court properly concluded, <u>see</u> J.A. at 1322-23, appellant's federal constitutional claim fails because it is procedurally defaulted. Although appellant contended on direct appeal that his sentence by the jury violated state law, he never asserted that such a violation rose to the level of a federal constitutional violation. <u>See id</u>. at 457-58 (brief of appellant on direct appeal); <u>see generally Duncan</u> v. <u>Henry</u>, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").**4**

On direct appeal, the Virginia Supreme Court did not address any federal constitutional claim, but held only that, under the Virginia statute, Thomas was properly sentenced. <u>See Thomas</u>, 244 Va. at 21-23. Insofar as appellant continues to maintain that he was entitled to be sentenced by the trial judge as a matter of Virginia law, we are foreclosed from considering this argument because federal habeas relief simply does not lie for errors of state law. <u>See</u> 28 U.S.C.

_____

**3** The statute has since been amended to clarify that a juvenile defendant charged as an adult with capital murder may be sentenced by the jury. <u>See</u> Va. Code § 16.1-272 (1998).
**4** Even if appellant's federal constitutional claim were not procedurally defaulted, we would reject it. Appellant advances no argument as to <u>why</u> it would rise to the level of a federal constitutional violation for a jury, instead of a trial judge, to impose a capital sentence on a juvenile defendant. Appellant's reliance on <u>Hicks</u> v. <u>Oklahoma</u>, 447 U.S. 343 (1980), is therefore inapposite. In <u>Hicks</u>, the defendant was sentenced to 40 years in prison under a state statute subsequently found to be unconstitutional. <u>See id</u>. at 345. Appellant can point to no similar "arbitrary deprivation" of a due process interest in this case. <u>Id</u>. at 346.

5

§ 2254(d)(1) (allowing habeas review only for adjudication of claim by state court that "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). We therefore reject the remainder of appellant's claim.

III.

Appellant next raises two types of claims of ineffective assistance of counsel. Appellant first asserts that trial counsel was ineffective for failing to investigate and present evidence suggesting that Jessica Wiseman, and not appellant, fired the second of the two shots that killed Kathy Wiseman. Appellant next contends that trial counsel was ineffective in preparing and presenting expert psychological testimony as mitigating evidence at sentencing. Applying the two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984), we conclude that the state court's rejection of each of these claims was not unreasonable.

A.

Appellant first asserts that trial counsel was ineffective for failing to investigate and present evidence suggesting that Jessica Wiseman, and not appellant, fired the second of the two shots that killed Kathy Wiseman. Appellant claims that he told his court-appointed psychological expert, Dr. Earle H. Williams, that he did not fire the second shot. See, e.g., J.A. at 747 (report of Dr. Williams of March 13, 1991) (noting that "Chris intimated that he did not fire all the shots"); id. at 755-56 (report of Dr. Williams of August 6, 1991) (reporting that Thomas said, "I only shot once"). Appellant contends, however, that trial counsel failed adequately to pursue this lead.

We reject appellant's argument because trial counsel's "failure" to investigate evidence that appellant did not fire the second shot was not unreasonable. First, overwhelming evidence indicated that appel-

lant did indeed fire the second shot. Appellant repeatedly told trial counsel that he fired both of the shots that killed Kathy Wiseman. See, e.g., id. at 765, 935, 937, 1112.**5** Trial counsel was evidently aware of the fact that Williams had reported that appellant had indicated that he might not have fired the second shot,**6** and confronted appellant with this information: however, even after trial counsel "begged" appellant to "come clean" about the second shot, appellant reiterated that he had fired both shots. Id. at 765, 937, 1018, 1114-15, 1117-18.**7**

In view of appellant's repeated assertions that he fired both shots, trial counsel was under no obligation to investigate further the possibility that appellant did not fire the second shot. As the Supreme Court noted in Strickland:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's

_____

**5** Appellant did not testify at trial, and only recently swore out an affidavit that he did not fire the second shot. See J.A. at 1332-34.

**6** Appellant contends that trial counsel could not possibly have confronted appellant with Dr. Williams' testimony because Dr. Williams' final report was dated on August 6 and trial counsel did not meet with appellant between August 6 and the trial. This argument, however, is disingenuous: Dr. Williams reported the possibility that appellant did not fire the second shot as early as March 13, 1991, in a letter to appellant's counsel. See id. at 747.

**7** Trial counsel even told appellant that there was no reason to lie in order to protect Jessica Wiseman because she had already been sentenced. See id. at 1141.

7

> failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691; see also Barnes v. Thompson, 58 F.3d 971, 979-80 (4th Cir. 1995) ("[T]rial counsel. . . may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation.").

Despite the fact that trial counsel was under no obligation to investigate further the possibility that appellant did not fire the second shot, trial counsel nevertheless did so. First, trial counsel interviewed "dozens of people," none of whom "even remotely suggested" that Jessica Wiseman fired the second shot. J.A. at 1017.[8] Further, trial counsel thoroughly investigated the forensic evidence and concluded that there was no reason to believe that appellant did not fire the second shot. See id. at 935-36, 938, 1113.[9] In view of the fact that trial counsel was under no obligation to investigate further the theory that appellant did not fire the second shot, but nevertheless thoroughly did so, we agree with the district court that trial counsel's actions were reasonable, see J.A. at 1299, and therefore reject appellant's first ineffective assistance claim.[10]

_____

[8] Appellant notes that his mother recently testified in an affidavit that appellant specifically said that he did not fire the second shot. See id. at 771-72. Trial counsel spoke to appellant's mother before the trial, however, and found her uncooperative. See id. at 764-65.

[9] We note that the only contrary forensic evidence presented by appellant is the report of a forensic expert that was never presented to any court below. See id. at 1331. Appellant has failed to present any evidence that he was somehow prohibited from presenting the report below, and therefore we do not consider it. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 8-12 (1992).

[10] Even if trial counsel's failure further to investigate appellant's claims were somehow unreasonable, it would not be prejudicial because appellant would still have been guilty of capital murder even if he had only fired the first shot. See infra Part IV.

8

B.

Appellant next asserts that trial counsel was ineffective in preparing and presenting expert psychological testimony as mitigating evidence at sentencing. Appellant essentially makes two alternative claims. First, he argues that trial counsel failed adequately to prepare Dr. Earle Williams, his court-appointed psychiatric expert, to testify at sentencing. Second, he contends that trial counsel erred by using the prosecution's own psychological expert, Dr. Henry Gwaltney, rather than Dr. Williams, to testify as to mitigation.

We reject both of appellant's claims, concluding that trial counsel's actions in dealing with the psychological experts were reasonable. As regards appellant's claim concerning trial counsel's preparation of Dr. Williams, trial counsel testified that they initially had a very favorable impression of Dr. Williams, citing his "impressive" credentials, "evident" enthusiasm for the case, and "favorabl[e]" testimony for appellant at an initial suppression hearing. See J.A. at 766. Although Dr. Williams appears to have had no prior experience testifying in capital cases, see id. at 875-76, trial counsel spoke to him "on numerous occasions to see how his work was progressing," id. at 766.[11] As the sentencing hearing approached, however, trial counsel became aware that Dr. Williams was scared about testifying. See id. at 766-67, 973, 983, 1097. We see nothing in the record to indicate that trial counsel failed adequately to prepare Dr. Williams to testify at sentencing. To the extent that Dr. Williams was unprepared to testify, it was not because trial counsel was ineffective, but rather because Dr. Williams was. We therefore reject, as we have in the past, the effort by an appellant to recast a claim concerning the effectiveness of a court-appointed psychological expert as a claim of ineffective assistance of counsel. See, e.g., Wilson v. Greene, 155 F.3d 396, 400-03 (4th Cir.), cert. denied sub nom. Wilson v.Taylor, 119 S. Ct. 536 (1998).[12]

_____

[11] Although, as appellant points out, Dr. Williams' time records indicate that he actually met with trial counsel for only two hours, the time records do not indicate how often, or for how long, he talked with trial counsel on the telephone, though they do list some long-distance charges for such conversations. See J.A. at 880.

[12] Appellant contends that Dr. Gwaltney advised trial counsel to call Dr. Gary Hawk, another psychological expert, to assist in preparing the

9

As regards appellant's claim concerning trial counsel's use of Dr. Gwaltney, trial counsel's decision to do so was reasonable as a matter of trial strategy. On the eve of the sentencing hearing, trial counsel approached Dr. Gwaltney, who had previously expressed his willingness to testify on appellant's behalf. See J.A. at 987-88, 1025-26. Trial counsel concluded, not unreasonably, that it would be more convincing to use the prosecution's own expert to testify in mitigation. See id. at 972-73. Trial counsel's decision was especially reasonable because Dr. Gwaltney agreed to testify to exactly the same mitigating circumstance to which Dr. Williams would have testified: namely, that Jessica Wiseman was the motivating factor behind appellant's actions in murdering the Wisemans. See id. at 273. Trial counsel buttressed Dr. Gwaltney's testimony with the testimony of appellant's mother and schoolteachers, who testified about appellant's troubled youth and susceptibility to the influence of others. See id. at 1316.

Appellant makes two further claims regarding trial counsel's use of Dr. Gwaltney, neither of them availing. First, appellant contends that Dr. Gwaltney was unprepared to testify because he had not completed a full mitigation review. See J.A. at 887-88. Appellant even asserts, without citation to the record, that Dr. Gwaltney asked trial counsel to seek a continuance in order to give him enough time to conduct such a review. According to trial counsel, however, far from indicating that he was unprepared to testify, Dr. Gwaltney was "chomping at the bit" to testify on appellant's behalf. Id. at 1026. Further, Dr. Gwaltney spent several days examining appellant, conducted a variety of psychological and physical tests, spoke to a number of people with knowledge of appellant's behavior, and reviewed all of the relevant records, and therefore cannot be said to have been unprepared to testify at the mitigation hearing. See J.A. at 890-91.

Second, appellant argues that trial counsel should nevertheless have also called Dr. Williams because he would have testified as to an additional mitigating circumstance -- namely, that appellant was

_____

defense, and even spoke to Dr. Hawk himself, but that trial counsel failed to pursue the matter. See J.A. at 884-85. There is no evidence, however, that trial counsel had any concerns regarding Dr. Williams at the time of Dr. Gwaltney's suggestion, or indeed at any time until just prior to the sentencing hearing.

10

emotionally and mentally disturbed at the time of the murders. See id. at 756. Trial counsel, however, was aware of the fact that Dr. Gwaltney disagreed with Dr. Williams' assessment, see id. at 893, and indeed had said that he would "destroy" Dr. Williams' testimony on this point, see id. at 767, 1097. Instead of undermining the prosecution's own expert's testimony as to the controlling influence of Jessica Wiseman by presenting controverted testimony as to appellant's emotional and mental state, trial counsel decided not to call Dr. Williams to testify on the latter point at all. See id. at 1020-21. We conclude that this decision, too, was reasonable as a matter of trial strategy. In sum, because we find no fault with trial counsel's preparation and presentation of expert psychological testimony at sentencing, we reject appellant's second ineffective assistance claim.

IV.

Appellant next claims that he was actually innocent of Kathy Wiseman's murder because he did not fire the second shot. Appellant appears to be making three distinct claims, if unwittingly. First, appellant contends that the district court should have excused his procedural default on various constitutional claims because of his "gateway" claim of actual innocence. See Schlup v. Delo, 513 U.S. 298 (1995). Second, appellant makes a free-standing claim of actual innocence. See Herrera v. Collins, 506 U.S. 390 (1993). Third, appellant argues that, because he did not fire the second shot, he should not have been eligible for the death penalty because the aggravating circumstance of vileness would no longer exist. See Sawyer v. Whitley, 505 U.S. 333 (1992).

We begin by considering appellant's claims under Schlup and Herrera. Regardless of whether we apply the more lenient standard of Schlup or the stricter standard of Herrera, appellant's claims fail because appellant would still have been guilty of capital murder under Virginia law even if he had not fired the second shot. The medical examiner testified that the first shot, like the second, "would be lethal." J.A. at 122. Under Virginia law, an individual who fires such a shot can be found guilty of capital murder. "[W]here two or more persons take `direct part' in inflicting fatal injuries, each joint participant is an `immediate perpetrator' for the purposes of the capital murder statutes." Strickler v. Commonwealth, 241 Va. 482, 495 (1991)

11

(citation omitted). Indeed, relying on its reasoning in <u>Strickler</u>, the Virginia Supreme Court subsequently upheld a conviction for capital murder on almost identical facts, in a case in which the defendant and another individual each fired shots that "could have been lethal" into the victim's head. <u>Williams</u> v. <u>Commonwealth</u>, 248 Va. 528, 545 (1994). Therefore, even if appellant did not fire the second shot -- which, as a factual matter, is dubious in any event in view of the overwhelming evidence to the contrary -- he could not have been actually innocent as a legal matter. Consequently, we reject appellant's claims under <u>Schlup</u> and <u>Herrera</u>.

Appellant's claim under <u>Sawyer</u> is no more availing. Appellant contends that, provided that he did not fire the second shot, he should not have been eligible for the death penalty because he would no longer have qualified for the aggravating factor of vileness. For the aggravating factor of vileness to apply, the conduct of the defendant in committing the murder must be "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Va. Code§ 19.2-264.2 (1998). Appellant contends that, had he not fired the second shot, he would not qualify for the aggravating factor of vileness because the element of aggravated battery, caused by the lapse of time between the two shots he fired, would no longer exist. However, as the Virginia Supreme Court noted on direct appeal, appellant's argument fails because, even assuming that his actions would no longer constitute aggravated battery, they would still evince depravity of mind, in view of the extraordinary premeditation involved and the execution-style nature of the killings, and the lack of any evident remorse. <u>See</u> <u>Thomas</u>, 244 Va. at 24-25. Because appellant would therefore still have qualified for the death penalty even if he had not fired the second shot, appellant's claim under <u>Sawyer</u>, like his claims under <u>Schlup</u> and <u>Herrera</u>, must fail. Because appellant's actual innocence claims would fail even on the merits, they certainly fail under the more deferential AEDPA standard of review, and we therefore reject them.

V.

In connection with his substantive claims, appellant contends that the district court abused its discretion by refusing to grant his requests

12

for the appointment of a forensic expert to develop his claim of actual innocence, for the deposition of Jessica Wiseman for the same purpose, and for the deposition of Dr. Williams to develop his claim of ineffective assistance of counsel.**13**

To be entitled to discovery in a habeas proceeding, the petitioner must make a showing of good cause. See R. Governing Section 2254 Cases 6(a). We conclude that the district court did not abuse its discretion by denying appellant's requests because appellant failed to make the requisite showing with regard to any of his requests. Neither a forensic expert nor Jessica Wiseman could resuscitate appellant's claim of actual innocence because, even if either were able to establish that appellant did not fire the second shot at Kathy Wiseman, appellant's claim would still fail as a matter of law. See supra Part IV. Further, the deposition of Dr. Williams would be similarly unavailing, because Dr. Williams' testimony would have no bearing on the reasonableness, based on trial counsel's perceptions at the time, of trial counsel's strategic decision to call the prosecution's psychiatric expert rather than Dr. Williams. See supra Part III.B. "The opportunity for an evidentiary hearing in a federal habeas corpus proceeding is mandatory only where there is a factual dispute which, if resolved in the petitioner's favor, would entitle the petitioner to relief and the petitioner has not received a full and fair evidentiary hearing in state court." East v. Scott, 55 F.3d 996, 1000 (5th Cir. 1995). Because the requested discovery would have had no bearing on any of appellant's substantive claims, we conclude that the district court properly exercised its discretion in denying appellant's requests.

VI.

Finally, appellant contends that the district court improperly applied the more deferential standard of review in 28 U.S.C. § 2254(d) because the court looked only to whether his claims had been "decided" by a state court, not to whether they had been "adjudicated on the merits," as is required for section 2254(d) to apply. As this Court and several of our sister circuits have noted, however, the phrase "adjudication on the merits" in section 2254(d) excludes only

---

**13** We note that the district court did grant numerous of defendant's other discovery requests. See J.A. at 622-24.

13

claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion. <u>See Wright</u> v. <u>Angelone</u>, 151 F.3d 151, 156-57 (4th Cir.), <u>cert</u>. <u>denied</u>, 119 S. Ct. 313 (1998); <u>accord Green</u> v. <u>Johnson</u>, 116 F.3d 1115, 1121 (5th Cir. 1997); <u>Hennon</u> v. <u>Cooper</u>, 109 F.3d 330, 334-35 (7th Cir.), <u>cert</u>. <u>denied</u>, 118 S. Ct. 72 (1997).

Appellant also contends that the district court failed to evaluate whether the Virginia procedural default rule, as established in <u>Slayton</u> v. <u>Perrigan</u>, 215 Va. 27 (1974) and applied against some of appellant's claims, constituted an adequate and independent state ground for decision. This court has repeatedly recognized, however, that the <u>Slayton</u> rule does constitute an adequate and independent state ground. <u>See</u>, <u>e.g.</u>, <u>Wright</u>, 151 F.3d at 159-60. Further, appellant does not even allege, much less demonstrate, that the Virginia state courts have applied the rule in <u>Slayton</u> inconsistently. We therefore conclude that the district court properly enforced the default of claims barred under <u>Slayton</u>, and reject appellant's challenge.

<u>CONCLUSION</u>

Following the dismissal of his federal habeas corpus petition, Thomas filed a motion in this court for a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2). Because we conclude that Thomas has failed to make the requisite "substantial showing of the denial of a constitutional right," <u>id</u>., we deny Thomas' motion and dismiss his appeal.

<u>DISMISSED</u>

14