PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JERRY WAYNE CONNER,
          *Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina,
          *Respondent-Appellee.*

No. 04-23

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(CA-00-546-5-BO-HC)

Argued: February 1, 2005

Decided: May 3, 2005

Before LUTTIG, KING, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the majority opinion, in which Judge Shedd joined. Judge Luttig wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Kenneth Justin Rose, CENTER FOR DEATH PENALTY LITIGATION, INC., Durham, North Carolina, for Appellant. Steven Mark Arbogast, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Mark J. Kleinschmidt, CENTER FOR

DEATH PENALTY LITIGATION, INC., Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

---

**OPINION**

KING, Circuit Judge:

In April 1991, Jerry Wayne Conner was convicted by a jury in the Superior Court of Gates County, North Carolina, for the first-degree murders of Minh Linda Luong Rogers ("Minh") and her sixteen-year old daughter, Linda Minh Rogers ("Linda"), as well as the related crimes of first-degree rape and robbery with a firearm. The jury recommended that Conner be sentenced to death, and the presiding judge imposed two death sentences. On direct appeal, the Supreme Court of North Carolina affirmed Conner's convictions but vacated his death sentences, and awarded him a new capital sentencing proceeding. *State v. Conner*, 440 S.E.2d 826 (N.C. 1994) ("*Conner I*"). At his second sentencing proceeding, the jury again recommended and the judge imposed two death sentences.

Conner then unsuccessfully directly appealed the death sentences imposed after his retrial, *State v. Conner*, 480 S.E.2d 626, 627 (N.C. 1997) ("*Conner II*") *cert. denied*, 522 U.S. 876 (1997). He thereafter unsuccessfully sought state post-conviction relief. *State v. Conner*, No. 90-CRS-648;649 (N.C. Super. Ct. May 5, 1999) (the "MAR Opinion"); *State v. Conner*, 544 S.E.2d 550 (N.C. 2000). He then turned to the federal courts and sought habeas corpus relief, pursuant to 28 U.S.C. § 2254, in the Eastern District of North Carolina. *See Conner v. Lee*, No. 5:00-HC-546-BO (E.D.N.C. Mar. 12, 2004) ("Opinion I").[1] The district court dismissed Conner's § 2254 petition without a hearing, *see* Opinion I at 46, but granted his subsequent application for a certificate of appealability ("COA") under 28 U.S.C. § 2253(c), *see Conner v. Lee*, No. 5:00-HC-546-BO (E.D.N.C. July

---

[1]Conner's § 2254 petition names Marvin Polk, Warden of the Central Prison in Raleigh, North Carolina, as Respondent. We refer to Respondent Polk as "the State."

12, 2004) ("Opinion II"). The COA awarded by the district court relates to Conner's claim that his Sixth and Fourteenth Amendment rights were denied when Helene Knight, a local newspaper reporter who had extensively covered his first trial, was permitted to serve as a juror in his second sentencing proceeding. As explained below, we are obliged, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, to affirm the district court's denial of habeas corpus relief on the claim presented by Conner's COA.

I.

The factual underpinnings of Conner's convictions were described in some detail by the Supreme Court of North Carolina in its opinion in Conner's first direct appeal. Those facts are set forth here *in haec verba*:

The State's evidence at trial tended to show that on the evening of 18 August 1990, Harold Lowe, his girlfriend, Kathy Winslow, and Chris Bailey stopped at Rogers' Grocery outside Gatesville, North Carolina, at approximately 9:30 p.m. They parked in the lot under a streetlight facing the highway waiting for a friend, Will Harrell, to arrive. After a few minutes, Harold Lowe saw Minh Rogers and an unknown white male leave the store. Minh and the man talked for a few minutes and then Minh Rogers reentered the building. Chris Bailey testified that he first noticed the white male walking from the store toward a white car parked in the lot. A few moments later, that same white male was carrying a shotgun and walking toward the vehicle in which Bailey was sitting.

Not having paid further attention after Minh Rogers reentered the store, Mr. Lowe testified he was startled when that same man appeared at the passenger window of his truck holding "some kind of identification with a picture." The man stated he was an agent with DEA and that undercover officers were preparing to execute a drug bust in the immediate vicinity in an effort to seize over $ 1.5 million worth of cocaine. He further informed Mr. Lowe that if he did not

want to be an accessory to the crime, he and his friends should leave the premises immediately. Lowe, Bailey, and Wilson each positively identified defendant at trial as the man who approached their car and warned them to leave the parking lot.

Will Harrell testified that he stopped by Rogers' Grocery at approximately 9:50 p.m. on the evening of 18 August 1990. As he entered the store, he recognized the owner of the establishment talking to a white male he did not know. The white male was of medium build, was approximately five-feet ten inches tall, and was wearing a plaid shirt and a baseball cap. At trial, Mr. Harrell positively identified defendant as the man he saw in Rogers' Grocery on the night of 18 August 1990.

SBI [State Bureau of Investigation] Agent Eric A. Hooks testified to statements made by Daniel Oliver Croy in a series of interviews beginning on the morning of 19 August 1990. In essence, Mr. Croy told various investigating officers that he stopped by Rogers' Grocery on the evening of 18 August 1990 after dinner. He "drank some beer, sat around, and talked with Linda [sic] Rogers, [and] her daughter." During this time, a white stocky male of medium height, thirty to thirty-five years of age, entered the store, made some purchases, chatted for a while with Minh and then left. Mr. Croy noted that the individual had a moustache and was wearing a baseball cap. Mr. Croy left the grocery store around 8:45 p.m.; and as he was backing out of his parking space, the same man he had seen inside Rogers' Grocery drove up beside him on the driver's side of the car. The man told Mr. Croy that he was an "SBI agent working with DEA on a big drug deal that was going down in the area." At one point during the conversation, the man asked Mr. Croy if he would like to see his credentials. He then held up a pump shotgun and said "there's my credentials." Mr. Croy left shortly thereafter but recalls that the lights in the store were on and the store was apparently still open.

John Lambert, a part-time employee of Rogers' Grocery, testified that on the morning of 19 August 1990, he arrived

at the store at 9:00 a.m. only to find he had left his key at home. After retracing his steps, he returned to the store with the key and noted that the door lock didn't make the usual clicking sound. He then realized the door had apparently been left open overnight. When he entered the store, Mr. Lambert found the bodies of Minh and Linda Rogers.

Deputy George M. Ryan of the Gates County Sheriff's Department described the crime scene. The nude body of Linda Rogers was lying on her back in a large pool of blood concentrated around her neck, shoulders, and abdomen. He noted a gaping gunshot wound in her upper chest and that the teeth in her mouth were "just shattered." Minh Rogers' body was found on a lounge chair behind the counter. Although she was fully clothed, her pullover sweater had been pulled up just below her breasts and her shorts had been unzipped and pulled down. She was covered in blood. After securing the scene, Deputy Ryan notified the SBI.

Dr. Page Hudson, former Chief Medical Examiner for the State of North Carolina, performed the autopsies on 20 August 1990. He stated that the cause of death for Minh Rogers was a gunshot wound to the head causing massive destruction of the skull and brain. He further opined that the shot was fired from a very short distance — two to four feet. Spermatozoa were present in the vaginal cavity of Linda Rogers indicating that she had been sexually active just prior to her death. The younger woman died from a "shotgun wound to the under surface of chin and neck."

On the morning of 31 August 1990, SBI Special Agent Malcolm McLeod, Gates County Deputy Sheriff George Ryan, and Hertford County Deputy Sheriff Ronnie Stallings questioned defendant concerning the murders at Rogers' Grocery on the night of 18 August. After an initial attempt to mislead the officers, defendant related the following sequence of events. On the day defendant was fired from his job as a truck driver with Rose Brothers (either the thirteenth or fourteenth of August 1990), he stopped at the Fast Fare in Murfreesboro. He engaged in an extensive conversa-

tion with a black male whom he did not know personally but had seen on numerous occasions. The man was approximately six-feet tall, weighed 240 pounds, and was in his thirties with slightly graying hair. The conversation centered upon whether defendant was interested in making some quick, "illegal money." Even after being offered $ 7000 to kill a "Japanese woman who ran a store in Gates County," defendant informed the man he was not interested and left. However, as financial problems began to arise, defendant drove back to Murfreesboro to locate the black male. When he was unable to find him, defendant decided to kill the woman and try to collect the money afterwards.

Defendant further informed the officers that on Saturday, 18 August, he drove to Gates County, located Rogers' Grocery, and went inside. He left shortly thereafter since there were several customers inside. On the next several times he drove by, there were vehicles in the parking lot. When he finally found the lot relatively empty, he parked his car and entered the store carrying his 12-gauge pump, sawed-off shotgun with pistol grips. When he walked in, defendant told Minh Rogers he was going to shoot her. She laughed. He then forced her to lie down upon a lounge chair located behind the counter. When she attempted to rise, he shot her in the upper chest area from a distance of approximately eight (8) inches. Upon being startled by the victim's teenage daughter entering the main room of the store, defendant held her at gunpoint. After searching her for a weapon, he ordered her to take off her clothes. He then raped Linda Rogers and shot her in the upper chest. Defendant remembered talking with some people in the parking lot of Rogers' Grocery but does not recall identifying himself as a law enforcement officer. Before fleeing the scene, defendant picked up a dark colored briefcase, a bank bag, and the money from the cash register.

Defendant modified this version of his confession to state that, on 18 August 1990, he had stopped in Rogers' Grocery to get something to drink. An older white male and the woman who owned the store started to tease him — calling

him "cowgirl" or "cowboy". He became angry, left the store, and went to Alvin Riddick's home where he stayed until after dark. While drinking two bottles of George Dickel whiskey, defendant became more and more upset about his treatment at the store earlier in the day. He returned to the store finding only Minh Rogers and the white male present. As he entered the store, the white male called him a "dickhead." Defendant suggested the two men go outside and fight. Outside, however, the unidentified white male indicated he was not interested in fighting and left. Defendant then proceeded to kill the two women as he previously indicated.

The State produced extensive physical evidence through numerous witnesses including SBI agents, FBI agents, and deputies of the Gates and Hertford County Sheriffs' Departments which corroborated the testimony of the prosecution witnesses and the main elements of defendant's confession.

*Conner I*, 440 S.E.2d at 829-31. At the conclusion of the guilt phase of Conner's first trial, the jury convicted him on all charges — two counts of first-degree murder and one count each of first-degree rape and robbery with a firearm. *Id.* at 831. After the separate sentencing phase of the proceeding, the jury recommended that Conner receive two death sentences on the murder convictions. *Id.* On direct appeal, the Supreme Court of North Carolina found no error meriting reversal of Conner's convictions. *Id.* However, because the trial court had improperly restricted voir dire on whether prospective jurors would automatically impose the death penalty, in contravention of *Morgan v. Illinois*, 504 U.S. 719 (1992), the court vacated Conner's death sentences (but not his sentences for rape and robbery) and remanded for a new capital sentencing proceeding. *Id.*

In January 1995, Conner's second sentencing proceeding was conducted, pursuant to N.C. Gen. Stat. § 15A-2000 (providing requirements for capital sentencing proceeding). At its conclusion, the jury found two aggravating factors for each murder: that they were committed during the commission of a felony and were each part of a course of conduct by the defendant which included crimes of violence against another person. *Conner II*, 480 S.E.2d at 628. The jury also

found two statutory and three non-statutory mitigating factors, but concluded that the mitigating circumstances were insufficient to out-weigh the aggravating circumstances. *Id.* at 628-29. The jury recommended that Conner be sentenced to death on each murder conviction, which the trial judge imposed. *Id.* at 629.

On appeal, the Supreme Court of North Carolina upheld Conner's death sentences, *see Conner II*, 480 S.E.2d at 636, and the Supreme Court denied his petition for a writ of certiorari, *see Conner v. North Carolina*, 522 U.S. 876 (1997). On July 28, 1998, Conner filed a motion for appropriate relief ("MAR"), *see* N.C. Gen. Stat. § 15A-1415, in the Superior Court of Gates County, and the State thereafter responded with its answer and a motion for judgment on the pleadings.[2] On May 5, 1999, the Superior Court issued its MAR Opinion, denying Conner's MAR on the pleadings. *See* MAR Opinion at 38. On August 24, 2000, the Supreme Court of North Carolina declined to review the MAR Opinion. *State v. Conner*, 544 S.E.2d 550 (N.C. 2000).

On September 15, 2000, Conner filed his § 2254 petition for habeas corpus relief in the Eastern District of North Carolina, including a request for an evidentiary hearing. In November 2000, the State filed its answer and also a motion for summary judgment. On March 12, 2004, the district court granted the State's motion and denied Conner's request for an evidentiary hearing. *See* Opinion I. On August 11, 2004, Conner filed a motion in the district court seeking a COA on three bases, contending, *inter alia*, that he was denied his constitutional right to a fair trial when a local reporter, who had covered his first trial, later served as a juror in his second sentencing proceeding. On September 12, 2004, the district court granted Conner a COA on that claim only, pursuant to 28 U.S.C. § 2253(c), concluding that Conner had made a substantial showing of the denial of a constitutional right. The court denied Conner's application for a COA on his two other contentions. *See* Opinion II at 3. This appeal followed, and

---

[2]A defendant convicted of a capital crime in North Carolina may seek post-conviction relief by way of an MAR. An MAR is not identical to a habeas corpus petition but, in North Carolina, any attempt to obtain relief from "errors committed in criminal trials" may be made by MAR. *See* N.C. Gen. Stat. § 15A-1401.

we possess jurisdiction to review the claim presented by Conner's COA pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's "decision on a petition for writ of habeas corpus based on a state court record." *Basden v. Lee*, 290 F.3d 602, 608 (4th Cir. 2002)(internal quotation marks omitted). Additionally, we review for abuse of discretion a district court's failure to conduct an evidentiary hearing or to authorize discovery proceedings. *Thomas v. Taylor*, 170 F.3d 466, 474-75 (4th Cir. 1999).

Pursuant to AEDPA, a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in a decision that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court has explained, a state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Finally, a state court's findings of fact are entitled to a "presumption of correctness," which a petitioner may rebut only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.

Conner contends that he was denied his constitutional right to due process and to a fair and impartial jury, in violation of the Sixth and Fourteenth Amendments, because juror Knight was biased. Conner's argument is twofold: first, that Knight was biased because she failed to answer honestly a material question at voir dire, in contravention

of *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984); and, second, that Knight was necessarily biased because she had covered the first trial extensively as a reporter and had outside information about the case, under the principles enunciated in *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). Furthermore, Conner asserts that he is entitled to an evidentiary hearing as to juror bias. As explained below, we reject each of Conner's contentions.

A.

The Sixth Amendment, which is applicable to the states through the Fourteenth Amendment, *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961), requires that a defendant be accorded an impartial jury in all criminal prosecutions. Furthermore, as we observed in *Jones v. Cooper*, "'[d]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment.'" 311 F.3d 306, 310 (4th Cir. 2002) (quoting *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). Put simply, if "even one [partial] juror is empaneled" and the death sentence is imposed, "the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 728.

1.

In *McDonough*, the Supreme Court spelled out its particularized test for determining whether a new trial is required due to juror deceit during voir dire or on jury questionnaires. *Id.* at 556. In order to obtain a new trial under the two-part *McDonough* test, a defendant "must first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* Although in *McDonough* the juror's incorrect voir dire response was an honest mistake, the *McDonough* test has been applied equally to deliberate concealment and to innocent non-disclosure. *See Jones*, 311 F.3d at 310.

Conner contends that Knight "failed to answer honestly" under *McDonough* when she responded negatively to the following question

from the trial court during voir dire in the second sentencing proceeding: "And have you heard this case discussed by any person who indicated direct or firsthand knowledge of the facts about the case other than the witnesses that you heard?" Knight had, as a journalist, covered Conner's first trial extensively for the local newspaper, the *Gates County Index*. In the MAR proceeding, Conner submitted the affidavits of an investigator and two law students alleging that Knight had admitted to them that, as a local journalist, she had communicated with and obtained information regarding the murders of Linda and Minh, which was not available to the public, from Gates County Sheriff Elmo Benton and Deputy Sheriff George Ryan (who testified at Conner's first trial).[3] Conner maintains that, contrary to her voir dire response, Knight had direct or firsthand knowledge of the facts of the crime.

The MAR court determined that a fair and reasonable reading of the voir dire proceeding was that Knight did not consider police or investigators as individuals with "firsthand knowledge of the facts about the case." MAR Opinion at 8. Rather, the MAR court concluded that Knight interpreted the inquiry to refer to witnesses who had observed Conner at the murder scene on the night of the crime or who had discovered the bodies. *Id.* We are unable to find the MAR court's determination to be unreasonable, in light of Knight's forthright responses regarding her knowledge and coverage of Conner's first trial and the full awareness of all involved — the trial judge, the prosecutor, and the defense counsel — that she possessed detailed knowledge of the background of Conner's case and of his previous trial. *See* 28 U.S.C. § 2254(d)(2) (providing that writ shall not be granted unless adjudication resulted in decision based on unreasonable determination of facts in light of evidence presented in State court); *see also* MAR Opinion at 6-9 ("The transcript shows that the trial court, prosecutor, and trial counsel were all fully aware that juror Helene Knight had covered defendant's first trial in her professional capacity as a newspaper reporter."). And Conner offered no evidence

___

[3]Although the MAR court struck portions of the affidavits submitted by Conner because they contained "inadmissible hearsay," *see* MAR Opinion at 6, we do not reach his contention that this ruling was improper. Even considering the stricken portions of the affidavits, Conner is not entitled to relief.

to the contrary, *i.e.*, to show that Knight had in fact communicated with witnesses with "firsthand knowledge" of the crime, as that inquiry was interpreted by the MAR court. We therefore conclude that Conner is not entitled to relief on his contention that Knight "failed to answer honestly a material question" at voir dire. *McDonough*, 464 U.S. at 556.

2.

In the alternative, Conner contends that Knight's relationship to this case presents an extraordinary circumstance mandating that we find juror bias. *See Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) ("While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias.").**[4]** Those extreme situations, however, exist only "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988). Some examples provided by Justice O'Connor of circumstances where bias might be presumed include "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Phillips*, 455 U.S. at 222 (O'Connor, J., concurring).

Although a reasonable person could well view Knight's presence on the jury at Conner's second trial as troubling (given her extensive coverage and knowledge of the first trial), the underlying facts do not, standing alone, compel the conclusion that she was a biased juror.**[5]** In

---

**[4]**There may be some question as to whether implied bias remains a viable doctrine following the Supreme Court's majority opinion in *Smith v. Phillips*, 455 U.S. 209, 218-19 (1982). *Id.* at 221 (O'Connor, J., concurring) (writing separately to express her "view that the [majority] opinion does not foreclose the use of 'implied bias' in appropriate circumstances"); *cf. Fitzgerald v. Greene*, 150 F.3d 357, 365 (4th Cir. 1998) (noting that the majority opinion in Smith appeared to undermine the legitimacy of the implied bias doctrine). For our purposes here, however, we assume the doctrine's continued viability.

**[5]**In these circumstances, some may have difficulty understanding how all those involved — the defense counsel, the prosecution, and the trial

assessing a question of bias, we must examine Knight's motives and the "reasons that affect a juror's impartiality." *See Jones v. Cooper*, 311 F.3d 306, 313 (4th Cir. 2002) (quoting *McDonough*, 464 U.S. at 556). In these circumstances, there is simply no evidence that Knight had any improper motive, much less evidence raising questions as to her impartiality.

Conner's allegations regarding juror bias are readily distinguishable from the circumstances of those cases where courts have found such bias, for two fundamental reasons. First, in one set of those decisions, the jurors were allowed to serve over the objection of defense counsel, or counsel lacked knowledge of the facts giving rise to the juror's potential bias. *See Williams v. Taylor*, 529 U.S. 420 (2000) (remanding for evidentiary hearing where juror lied about relationship with prosecution witness and about prosecutor once representing her); *Leonard v. United States*, 378 U.S. 544 (1964) (reversing conviction where defendant had objected to composition of jury whose members included persons present when guilty verdict was returned against him in another case); *Wall v. Superintendent, Va. State Penitentiary*, 553 F.2d 359 (4th Cir. 1977) (ordering new trial where counsel objected to jurors who had served as jurors in another case where defendant had testified); *Donovan v. Davis*, 558 F.2d 201 (4th Cir. 1997) (ordering new trial where counsel had moved to quash jury venire to avoid having jurors from first trial seated at second trial). By contrast, Conner and his trial counsel (in addition to the judge and the prosecution) had actual knowledge of Knight's preexisting relationship with his case, and all those involved accepted her as a juror in his second trial. MAR Opinion at 9.[6]

---

judge — accepted Knight as a juror. There is no ineffective assistance claim in this appeal, however, and "[c]ounsel's actions during voir dire are presumed to be matters of trial strategy." *Miller v. Francis*, 269 F.3d 609, 615-16 (6th Cir. 2001); *see also Cage v. McCaughtry*, 605 F.3d 625, 627 (7th Cir. 2002); *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000); *Knox v. Johnson*, 224 F.3d 470, 479 (5th Cir. 2000).

[6]On this record, we have no basis on which to conclude that juror Knight's voir dire response that she had not "heard this case discussed by any person who indicated direct or firsthand knowledge of the facts about the case other than the witnesses that [she] heard" was at all mis-

Second, in other decisions where juror bias has been found, some outside influence impacted a juror during trial. *See Turner v. Louisiana*, 379 U.S. 466 (1965) (reversing conviction where deputy sheriffs who testified at trial ate with, conversed with, and ran errands for jurors during trial and defendant sought mistrial after they testified); *see also Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) (awarding evidentiary hearing where affidavit offered by petitioner alleged that juror was pressured by her husband during proceedings — apparently effectively — to vote for death sentence). In Conner's second trial, Knight had no improper outside contacts, either pressuring her to vote in a certain manner or to trust particular witnesses. And, as we have noted, Conner and his defense counsel were well-aware of Knight's extensive newspaper coverage and relationship with his case, unlike the situations presented in *Turner* and *Fullwood*. MAR Opinion at 6-9.

These distinguishing factors are significant for the reason that nothing here suggests that the jury was not "capable and willing to decide the case *solely* on the evidence before it." *Smith*, 455 U.S. at 217 (emphasis added); *see Turner*, 379 U.S. at 472-73 ("[T]he 'evidence developed' against a defendant shall come from the witness stand in a public courtroom."). As the MAR court observed, "[n]othing in [Knight's] responses shows an unwillingness or inability to be fair, impartial, follow the trial court's instructions, and base her decisions on evidence presented to her as a juror." MAR Opinion at 7-9 ("She unequivocally stated her ability to make her decisions solely on evidence that would be presented to her as a juror."). Put simply, Conner has failed to allege (and thus cannot establish) that anyone sought to influence the verdict in his second trial at any time before or during deliberations.

In these circumstances, Conner has failed to show that the MAR court's decision was contrary to, or an unreasonable application of,

---

leading; indeed, there is no indication that she was being other than entirely candid. Based upon her answers to the approximately 130 questions at voir dire, Conner's lawyer was well aware of Knight's knowledge of the prior death sentence and her relationship with the trial attorneys and witnesses.

clearly established Supreme Court precedent, because the decisions on which he relies, *i.e.*, *Williams*, *Leonard*, and *Turner*, are each distinguishable. Therefore, Conner is not entitled to § 2254 relief on the ground that juror Knight was biased.

B.

In seeking habeas corpus relief, Conner also requested that the district court conduct an evidentiary hearing, affording him the opportunity to examine the relevant witnesses. A federal court may not grant an evidentiary hearing to a habeas corpus petitioner if the petitioner "failed to develop the factual basis of [his] claim in state court." *See* 28 U.S.C. § 2254(e)(2). Because the State does not assert that Conner failed to develop the factual basis of his juror bias claim in state court, the district court could have conducted an evidentiary hearing on this point, but only if Conner had first alleged "additional facts that, if true, would entitle him to relief," and if Conner had then established one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963). *Fullwood*, 290 F.3d at 681 (internal quotation marks omitted).[7]

There was no error in the district court's denial of an evidentiary hearing because, even if the facts alleged by Conner are taken as true, he would not be entitled to relief. More specifically, Conner failed to allege sufficient facts to entitle him to relief on grounds that Knight "failed to answer honestly a material question" at voir dire. *See* *McDonough*, 464 U.S. at 556. In the MAR proceeding, the court found that Knight had been asked on voir dire only if she had contact with witnesses to the crime:

[A] fair and reasonable reading of the entire voir dire leads to the conclusion that juror Helene Knight did not consider policy and investigative personnel 'persons with firsthand knowledge.' There is no contention or evidence that juror Helene Knight ever spoke with or otherwise had any contact

---

[7]We need not address any issue relating to the *Townsend* factors, because Conner has not alleged facts that, if true, would entitle him to habeas corpus relief. *See Townsend*, 372 U.S. at 313 (listing factors to be assessed in determining whether evidentiary hearing is warranted).

with persons present at the Rogers Grocery on the evening
of the murders or who initially discovered the bodies.

MAR Opinion at 8. This determination constitutes a factual finding
made by a state court that we presume to be correct, *see* 28 U.S.C.
§ 2254(e)(1), and which Conner has failed to rebut by clear and con-
vincing evidence, *see* 28 U.S.C. § 2254(e)(2)(B). As the MAR court
observed, even if Conner could prove the allegations made in the affi-
davits, he has offered no evidence to show that Knight lied on voir
dire. MAR Opinion at 8. Therefore, we are unable to conclude that
the district court erred in its determination that Conner is not entitled
to an evidentiary hearing. *See McDonough*, 464 U.S. at 556.

IV.

Pursuant to the foregoing, we affirm the district court's denial of
habeas corpus relief.

*AFFIRMED*

LUTTIG, Circuit Judge, dissenting:

Conner has alleged facts that, if true, establish that the state court's
decision of his Sixth Amendment claim was *both* contrary to *and* an
unreasonable application of the Supreme Court's clearly established
law on juror bias. He is thus entitled to an evidentiary hearing. I
respectfully dissent.

I.

In rejecting Conner's Sixth Amendment claim, the state court
relied exclusively on *McDonough Power Equipment, Inc.* v. *Green-
wood*, 464 U.S. 548 (1984), without addressing the Supreme Court's
Sixth Amendment cases on actual juror bias, such as *Smith* v. *Phillips*,
455 U.S. 209 (1982). *See* J.A. 451-58. Thus, by assuming that *McDo-
nough* provides the sole avenue of relief for cases like Conner's, the
state court required Conner to prove that juror Knight deliberately lied
at voir dire in order to establish his Sixth Amendment claim under
*Smith*. J.A. 452. This was error. No less than five members of the

Supreme Court wrote or joined separate opinions in *McDonough* to emphasize that *McDonough* did *not* so limit the applicability of *Smith* and related cases. *See McDonough*, 464 U.S. at 556-57 (Blackmun, J., concurring) ("I write separately to state that I understand the Court's holding not to foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury. Thus, regardless of whether a juror is honest or dishonest, it remains within a trial court's option . . . to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias . . . ."); *id.* at 558 (Brennan, J., concurring in the judgment). In fact, *McDonough* was a civil case that did not even present the issue of juror bias under the Sixth Amendment. *See id.* at 549, 555. In light of this, numerous courts, including the Fourth Circuit, have likewise held that *McDonough* does not provide the sole avenue of relief for a criminal defendant alleging actual juror bias. *See*, *e.g.*, *Jones* v. *Cooper*, 311 F.3d 306, 310 (4th Cir. 2002) ("The *McDonough* test is not the exclusive test for determining whether a new trial is warranted: a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial."); *Fitzgerald* v. *Greene*, 150 F.3d 357, 362-63 (4th Cir. 1998) (same); *Zerka* v. *Green*, 49 F.3d 1181, 1186 n.7 (6th Cir. 1995); *Amirault* v. *Fair*, 968 F.2d 1404, 1405-06 (1st Cir. 1992); *Cannon* v. *Lockhart*, 850 F.2d 437, 440 (8th Cir. 1988). And the Supreme Court has unanimously confirmed this interpretation by citing *only Smith*, and not *McDonough*, as the law governing a claim of actual juror bias that, like Conner's, involved an honest but misleading response by the juror at voir dire. *See Michael Williams* v. *Taylor*, 529 U.S. 420, 442 (2000).

Therefore, the state court relied on a rule of law that contradicts the holdings of *Smith* and other juror-bias cases, which do not require a defendant to prove that the biased juror deliberately lied at voir dire. The state court's decision was thus "contrary to" clearly established law. *See Terry Williams* v. *Taylor*, 529 U.S. 362, (2000) ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.").

## II.

Because the state court's treatment of Conner's juror-bias claim resulted in a decision that was contrary to clearly established law, its

decision is not entitled to deference. *See Rose* v. *Lee*, 252 F.3d 676, 689-90 (4th Cir. 2001). But even if the state court had applied *Smith* and related cases, as required, Conner would nonetheless be entitled to relief, because the state court's denial of his claim necessarily involved an unreasonable application of those cases. *See* 28 U.S.C. § 2254(d)(1).

It is clearly established that the presence of a single biased juror in a capital trial violates the Sixth Amendment, *Morgan* v. *Illinois*, 504 U.S. 719, 728 (1992), and that the remedy for credible allegations of juror bias is a hearing at which to prove actual bias. *See Smith*, 455 U.S. at 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."); *Remmer* v. *United States*, 347 U.S. 227, 230 (1954) (reversing the district court's denial without hearing of the defendant's motion for a new trial based on alleged juror bias, and remanding for an evidentiary hearing). This clearly established principle has been applied on innumerable occasions, including on habeas review. *See*, *e.g.*, *Michael Williams*, 529 U.S. at 440-42 ("[T]hese omissions [of information at voir dire] as a whole disclose the need for an evidentiary hearing."); *Fullwood* v. *Lee*, 290 F.3d 663, 682 (4th Cir. 2002) (granting an evidentiary hearing to determine whether a juror was improperly influenced by her husband to vote for the death penalty).

Here, the circumstances that Conner alleges plainly establish the risk of actual bias. He alleges that juror Knight engaged in confidential conversations about his case with investigators and a key trial witness, *see* J.A. 408, and that these conversations included victim-impact evidence highly relevant to the sentencing trial in which Knight sat as a juror. J.A. 422. These allegations raise the obvious possibility that Knight relied on such extraneous evidence (and other yet undisclosed communications) in her deliberation about whether to sentence Conner to death. Such would constitute a quintessential instance of actual juror bias.

Therefore, this is plainly *not* a case in which Conner's allegations, even if true, would be insufficient even to raise a credible inference of bias. *See Jones* v. *Cooper*, 311 F.3d 306, 313 (4th Cir. 2002). On the contrary, the risk of bias here was at least as great as that in *Smith*,

and comparable to or greater than the risk in *virtually every other Supreme Court case on actual bias*. *See Smith*, 455 U.S. at 212 (juror applied for a job at the prosecutor's office during trial); *Remmer*, 347 U.S. at 228 (juror was exposed to a comment "in jest" that he could profit from a favorable verdict to the defendant, and to a subsequent FBI investigation of the comment); *Chandler* v. *Florida*, 449 U.S. 560, 575 (1981) (jurors were exposed to unusual publicity and a sensational courtroom atmosphere); *Michael Williams*, 529 U.S. at 440 (juror had been married, fifteen years previously, to an investigator and trial witness). Indeed, the risk of bias in Knight's conversations was as great, or greater than, the risk of bias in cases where the Supreme Court has held that the circumstances compelled a finding of *implied* bias. *See Parker* v. *Gladden*, 385 U.S. 363, 365 (1966) (per curiam) (jurors were exposed to two offhand comments by a bailiff asserting the defendant's guilt); *Turner* v. *Louisiana*, 379 U.S. 466, 468 (1965) (two prosecution witnesses served among the bailiffs in charge of the sequestered jury, but without discussing the case); *Leonard* v. *United States*, 378 U.S. 544, 544-45 (1964) (per curiam) (a prior jury announced its guilty verdict in the presence of the jurors who would try the defendant on a closely related crime).

The state seeks to distinguish *Smith* and like cases by arguing that Conner's counsel had notice of Knight's involvement in the prior trial and opportunity to strike her at voir dire. *See Appellee's Br.* at 19, 22 ("Conner's trial counsel had full knowledge of the information Ms. Knight possessed as a potential juror. It was incumbent on trial counsel to probe deeper if desired or deemed necessary."). But such is an unreasonable ground on which to distinguish *Smith*, because Knight's misleading replies at voir dire deprived counsel of notice of the *exact* source of bias challenged here. *See* J.A. 245-46 ("THE COURT: And have you heard this case discussed by any person who indicated direct or firsthand knowledge of the facts about the case other than the witnesses that you heard? MS. KNIGHT: No, sir."); J.A. 398, 403 (affidavits of defense counsel averring that Knight's "answers during voir dire indicated [to them] that she had no such direct contact with witnesses"); *cf. Michael Williams*, 529 U.S. at 442 (providing an evidentiary hearing where "[t]he trial record contains no evidence which would have put a reasonable attorney on notice that [the juror's] nonresponse was a deliberate omission of material information"). By nevertheless insisting that Conner's claim fails because Knight's answers

were *honest* but misleading, the state merely rehashes the state court's erroneous conclusion that *McDonough* provides Conner's exclusive avenue of relief. As shown above, it does not.

### III.

Because the state court denied Conner a hearing on the issue of Knight's bias, J.A. 458, he has not "failed to develop" the relevant facts in state court through lack of diligence. *See* 28 U.S.C. § 2254(e)(2); *Michael Williams*, 529 U.S. at 430. For the same reason, Conner fulfills at least one of the six factors of *Townsend* v. *Sain*, 372 U.S. 293, 313 (1963) (requiring an evidentiary hearing when "the material facts were not adequately developed at the state-court hearing"). Therefore, Conner is entitled to an evidentiary hearing in the district court to determine what was actually communicated to Knight and whether it influenced her deliberations. If Conner can establish both that the alleged communications included prejudicial information not produced at trial, and that juror Knight (or her fellow jurors) relied on such evidence to Conner's detriment, I would grant him a new sentencing hearing.

For these reasons, I dissent from the majority's judgment.